| | | |
|---|---|---|
| HARRIS PUBLISHING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CV09-426-E-REB |
| | ) | |
| vs. | ) | **MEMORANDUM DECISION AND ORDER** |
| | ) | |
| METRO MARKETING, INC., | ) | (Dkts. 28 & 30). |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pending before the Court is a Motion for Summary Judgment filed by Defendant Metro

Marketing, Inc. ("Metro"), (Dkt. 28), and a related Motion for Attorney Fees, (Dkt. 30).  Counsel

appeared before the Court on January 26, 2011 and provided oral argument on the Motion for

Summary Judgment.  Having considered those arguments and the record in this matter, the Court

enters the following order denying Metro's Motions:

## I.  BACKGROUND[1]

In 1984, Plaintiff Harris Publishing, Inc. ("Harris") developed a 2D map of the Idaho

Falls, Idaho region.  The map has been published bi-annually or annually since then.  The Harris

---

[1]  The Background section is drawn from undisputed facts.  The factual information cited in the
Discussion section, *infra*, may be drawn from facts that are disputed, but the dispute is noted
in the context of each discussion.  The Court has not relied on any evidence challenged in
Metro's Motion to Strike (Dkt. 50), without discussing the evidentiary challenges raised by
Metro and resolving them, as the Court explained it would do in its order denying the motion
to strike (Dkt. 70).

map at issue in this case is a map of the City of Idaho Falls ("Idaho Falls Map"). Included on the reverse side of the Idaho Falls Map is a regional map of Southeast Idaho ("Regional Map"). Plaintiff's Complaint specifies that its copyright infringement claim is related to the Idaho Falls Map, but the Court has ruled that evidence related to the Regional Map may be relevant to the issues to be decided on summary judgment.

On June 5, 2009, Harris submitted a Copyright Registration for the 2006-07, 2007-08 and 2008-09 versions of its map to the U.S. Copyright Office. On August 21,2009, Harris submitted a Copyright Registration for the 2009-10 version of the Harris Publishing Map, but the 2009-10 map is not at issue in this case, except possibly as relevant evidence. The U.S. Copyright Office approved the applications and issued Certificates of Registration for the 2006-07, 2007-08, 2008-09, and 2009-10 versions of the Harris Map.

Harris brought suit against Metro for copyright infringement, unfair competition, and unjust enrichment based on Metro's production of an Idaho Falls map created in 2009 ("Metro Map"). Metro seeks summary judgment on all claims, but focuses on the copyright claim, arguing that (1) Harris is not the author of the Harris Map, and so does not own the copyright; (2) even if Harris has a copyright interest, Metro did not copy the map but rather independently authored its map; and (3) any copying is permitted under the fair use doctrine. Def.'s Mem., pp.1-2 (Dkt. 28-1).

## II. DISCUSSION

### A. The Summary Judgment Standard

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is

"not a disfavored procedural shortcut," but is instead the "principal tool [ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence, including all reasonable inferences which may be drawn therefrom, must be viewed in a light most favorable to the non-moving party and the Court must not make credibility findings. *See id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *See id*. at 256-57. The non-moving party must go beyond the pleadings and show "by [his] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Statements in a brief, unsupported by the record, cannot create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n. 3 (9th Cir. 1995).

**B.      Copyright Claim**

Maps, by statute, are protectable "[p]ictorial, graphic, and sculptural works." 17 U.S.C. § 101. However, as standardly expressed, "[c]opyright law protects an author's expression; facts and ideas within a work are not protected." *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990).

To prevail on its infringement claim, Harris "must demonstrate (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Benay v. Warner Bros. Entertainment, Inc.*, 607 F.3d 620 (9th Cir. 2010). "[R]egistration of a copyright certificate constitutes prima facie evidence of the validity of a copyright in a judicial proceeding commenced within five years of the copyright's first publication," as is the case here. *Entertainment Research Group. v Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997); *see also* 17 U.S.C. § 410(c).

This "statutory presumption of validity can be rebutted if [Metro] demonstrates that [Harris's] work is not original but copied from another's work." *Entertainment Research*, 122

F.3d at 1218 (internal quotations and citations omitted).  If that occurs, the burden of proving

validity shifts back to Harris.  *Id.*

**1.      Material Facts As To Whether the Harris Map is a Derivative Work Are
          Disputed, Precluding Summary Judgment**

Bob Reece hand-drew the first Harris Map in 1984.  McFarland Aff., Ex. A, p.6 (Dkt. 28-

4).  Jason Harris testified that the map was drawn to scale, and Reece worked from the City of

Idaho Falls Planning & Zoning Map ("P&Z Map") to develop the Harris Map.  McFarland Aff.,

Ex. A, p.26.  When questioned whether Reece relied on any other source,  Harris responded: "I

don't think so."  McFarland Aff., Ex. A, p. 29.  Harris also testified that when the map was

updated by computer in the mid-1990's, just the P&Z map was used, along with prior versions of

the Harris maps.  McFarland Aff., Ex. A., pp. 36-38.

Based on this deposition testimony, Metro argues that Harris is "a mere verbal and non-

exclusive licensee to whatever copyrights may be owned by the City of Idaho Falls Planning &

Zoning ["P&Z"] Department and its map," or, "at best, the Harris Map is a derivative of the

P&Z Map."  Def.'s Mem., pp.3-4 (Dkt. 28-1).  Harris does not claim that it has a written,

exclusive licence agreement with the P&Z,[2] and objects to the characterization of its map as a

derivative work.

A derivative work is defined as "a work based upon one or more preexisting works, such

as a translation . . . art reproduction, abridgment, condensation, or any other form in which a

---

2   The licensee issue comes into play because, when a copyright holder has granted a license to
    create a derivative work, the licensee is not entitled to sue for copyright infringement in the
    original copyrighted work, unless the license is an exclusive license: "a non-exclusive license
    . . . gives . . . no standing to sue for copyright infringement."  *Sybersound Records, Inc. v.
    UAV Corp.*, 517 F.3d 1137, 1146 (9th Cir. 2008).

work may be recast, transformed, or adapted." 17 U.S.C. § 101. "A work consisting of editorial revisions, annotations, elaborations, or other modifications, which, as a whole, represent an original work of authorship, is a 'derivative work'." *Id.* "The copyright protection afforded to derivative works is more limited than it is for original works of authorship. . . . [T]he copyright in a derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." *Entertainment Research*, 122 F.3d 1211, 1220 (9th Cir. 1997) (internal quotations and citations omitted and emphasis added). To "support a copyright the original aspects of a derivative work must be more than trivial," and "must reflect the degree to which it relies on preexisting material and must not in any way affect the scope of any copyright protection in that preexisting material." *Id.* (internal citations omitted).

Although Metro repeatedly argues that the Harris Map "was taken exclusively from the P&Z Map," there is an issue of fact about this. Jason Harris did testify about what he thought Bob Reece used as a source when creating the 1984 map, but other individuals have filled in information indicating that other sources also were used. Dayne Dingman, a graphic artist who has worked on the Harris maps for eight years, stated that "[o]ne of reference materials used by Harris to create the Harris Idaho Falls Map" is the P&Z Map, but the P&Z Map "identifies only the location and names of streets in the Idaho Falls area," Dingman 1st Aff., ¶ 7 (Dkt. 41)[3], and the Harris Map includes landmarks not included on the P&Z Map.

---

3    The Court notes that the First Dingman Affidavit is subject to one of the evidentiary objections Metro made, but those objections were only to paragraphs 12-13, 15, 17, and 19-24, which involve statements about a 2010 Harris Map that Metro argues is not relevant in this case. *See* Def.'s Mot. to Strike, p. 2 (Dkt. 50).

Dingman, who has helped revise the Harris Maps,[4] also explained that "Harris generally uses the P&Z Map as a starting point in the creation of its various versions of the Harris Idaho Falls Map, Dingman 1st Aff., ¶ 7 (Dkt. 41). Jason Harris testified in deposition that Harris also (but more recently) uses the emergency services map created by the City of Idaho Falls and Bonneville County as a reference to create the Harris Idaho Falls Map. McFarland Aff., Ex. A, p.39 (Dkt. 28-4). Dingman adds that "[t]he placement and proportion of each revision *is a freehand estimate*, based loosely on *various other reference materials*." Dingman 1st Aff., ¶ 8 (Dkt. 41) (emphases added). In contrast, the P&Z Map streets "are drawn based on information provided by the city surveyors and accurately depict the streets of the City of Idaho Falls to scale." Dingman 1st Aff., ¶ 7 (Dkt. 41). Thus, the P&Z Map factually represents the streets of Idaho Falls, Idaho as they exist or are planned, whereas on the Harris Map, according to Dingman, "virtually every roadway, intersection, cul-de-sac, railroad, waterway, etc., . . . . have their own unique curvature and scale, in relation to adjacent map features." *Id.* at ¶ 22.[5]

These facts support Harris's argument that its Idaho Falls Map identifies streets, cities, and boundaries which exist outside and well beyond the coverage of the P&Z Map and that these additional streets were taken from other sources, including maps of Bonneville County and

---

[4] Dingman's second Affidavit describes his work with Harris on the Idaho Falls maps. Dingman 2d Aff., p.2 (Dkt. 59-3).

[5] Metro objected to paragraph 22 because the observations were based on the 2010 Harris Map, which Metro could not have used to create its map in 2009. *See* Def.'s Mot. Strike (Dkt. 50). However, Dingman clarified this information in his second affidavit, stating that he used the 2010 map because he had ready access to it in digital form and averred that "[although the 2010 Version does incorporate additions and corrections to the prior versions of the Harris Idaho Falls Map, in all other ways *it is the same work of art*." Dingman 2d Aff., ¶ 18 (Dkt. 59-3).

independent observation.  Because there is conflicting information in the record about how many

sources were used, and in what way, to create the Harris Map, the Court cannot determine on

summary judgment whether the Harris Map should be considered a derivative work, or not.  In

this regard, the record indicates that Harris's addition of landmarks to its map had to be drawn

from a source other than the P&Z Map.  This, coupled with the freehand nature of its map and, if

true, the use of other sources including personal observations, tips the scale in favor of finding

the work is non-derivative.  *See, e.g.*, *United States v. Hamilton*, 583 F.2d 448, 449, 452 (9th Cir.

1978) (explaining that the copyright claimant relied on "an Idaho Department of Highways map

as the principal base in preparing" its map, and on "maps published by United States Geological

Survey, United States Forest Service, and the Bureau of Land Management," and the use of so

many sources supported a finding that the map "was an original product of significant efforts"

and that the "copyright was valid").  Even if the work is derivative, limited copyright protection

is afforded to the original creative elements added by Harris.

### 2. The Harris Map Contains Copyrightable Elements

Because Metro has not demonstrated that the statutory presumption of copyright validity

is rebutted, Metro bears the burden of proving invalidity.  In this regard, Metro argues that Harris

"cannot identify with any degree of particularity any such sufficient original and creative

elements that were both authored by Harris and added to the Harris Map and that were copied on

the Metro Map."  Def.'s Mem., p.7 (Dkt. 28-1) (citing McFarland Aff., Ex. A, pp. 89-90).  Metro

emphasizes, among other things, that Jason Harris agreed that Harris did not come up with "the

names or locations for landmarks such as the Idaho Falls cemeteries."  Def.'s Mem., p.7 (Dkt.

28-1).

The Second Circuit persuasively has explained that "originality in the manner of expression" is copyrightable and originality can be expressed by mapmakers "in the selection or elimination of detail, the size, shape, and density of informative legends, the establishment of conventions relating to color or design to represent topographical or other features, and many other details of presentation." *Sparaco v. Lawler, Matusky, Skelley, Engineers, LLC*, 303 F.3d 460, 467 (2nd Cir. 2002) (cited with approval by the Ninth Circuit in the *Hamilton* case). "Although a mapmaker is not protected from copying of the factual information conveyed in the map, she is protected from the copying of any originality in the manner of expression employed in communicating the factual information." *Sparco v. Lawler*, 303 F.3d 460, 467 (2nd Cir. 2002). *See also Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 747-748 (2nd Cir. 1998) (explaining that original material includes the "overall manner in which the [mapmaker] selected, coordinated, and arranged the expressive elements in its map, including color, to depict the map's factual content"). "When a work displays a significant element of compilation, that element is protectable even though the individual components of the work may not be." *Hamilton*, 583 F.2d at 451. "Trivial elements of compilation and arrangement," such as "coloring, symbols, and key used in delineating boundaries," are not copyrightable since they fall below the threshold of originality. *Id.* at 452, n.2.

Harris repeatedly asserts that the streets on its map were hand drawn and are not an exact replication of the P&Z Map, nor do the streets copy or mimic the exact location of the streets. Harris also points out that the P&Z Map includes planned, but not yet constructed, streets in Idaho Falls, and Harris made modifications to the information shown on the P&Z Map to reflect on the Harris Idaho Falls Map only existing streets, *i.e.*, "just the roads you can drive on".

Williams 2d Aff., Ex. A., pp. 29-30 (Dkt. 45).[6]  Additionally, the Harris Idaho Falls Map

identifies parks, cemeteries, the Snake River, schools and the airport, and "[m]ost of the

landmarks identified on the Harris Idaho Falls Map are not even reflected on the P&Z Map."

Pl.'s Opp. Mem., p. 7 (Dkt. 39); *see also* Dingman 1st Aff., ¶ 7 (Dkt. 41).  Moreover, Harris

points out that the distance between intersections, the size and direction of streets, the location

and relative size of subdivisions, and the size, depiction and location of landmarks were all

drawn based on the cartographers' interpretation with the intent to present a workable map that

adequately reflects the areas depicted.  *See Metcalf v. Bochco*, 294 F.3d 1069, 1073 (9th Cir.

2002) (quoting *Shaw*, 35 F.3d at 1446, and explaining that infringement "can be based on

original selection and arrangement of unprotected elements").

Metro counters that "[t]he landmarks identified by Harris are facts, and by definition,

they lack sufficient creativity to merit copyright protection."  Def.'s Mem., p.8 (Dkt. 28-1)

(citing *In re: Subpoena Issued Pursuant To The Digital Millennium Copyright Act To:*

*43SB.com, LLC*, No. MS-07-6236-EJL-MHW, at 5 (D. Idaho Nov. 16, 2007)).  It is notable,

however, that the protectable elements of maps include "not only . . . the depiction of a

previously undiscovered landmark or the correction or improvement of scale or placement, but

also . . . selection, design and synthesis."  *Hamilton* at 452; *see also Stone v. Perpetual Motion,*

*LLC*, No. 02-36084, 2004 WL 162561 (9th Cir. Feb. 20, 2004).  "When a work displays a

significant element of compilation, that element is protectable even though the individual

---

[6]   This affidavit also was a subject of Defendant's Motion to Strike (Dkt. 50); however, the
only objection was to a paragraph not related to the Exhibit cited here.  Additionally, the
Court notes that this is the only place in the record it could access page 30 of Jason Harris's
July 13, 2010 deposition; it was not included in the deposition transcript provided in Exhibit
A of the McFarland Affidavit (Dkt. 28-4).

components of the work may not be . . ." *Hamilton*, at 451. The Court finds sufficient evidence of creativity in Harris's selection of what to include in its Map and its arrangement of the landmarks and design of the Map, to determine that those elements are protected by Harris's copyright.

### 3. The Record Contains Enough Evidence of Substantial Similarity Between the Harris and Metro Maps For This Case to Go Forward

Because, in most cases, direct evidence of copying is not available, a plaintiff may establish copying by showing that the infringer had access to the work and that the two works are substantially similar. *Shaw*, 919 F.2d at 1356. *See also Tienshen, Inc. v. C.C.A. Int'l (N.J), Inc.*, 895 F.Supp. 651,656 (S.D.N.Y. 1995) (explaining that "[c]opying is often proven through *circumstantial evidence* consisting of access and probative similarity between the two works") (emphasis added). Under the "inverse ratio" rule, if a defendant had access to a copyrighted work, the plaintiff may show infringement based on a lesser degree of similarity between the copyrighted work and the allegedly infringing work. *See Shaw*, 919 F.2d at 1361 (citing 2 M. Nimmer, Nimmer on Copyright § 143.4, at 634 (1976)); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003)).

"Although summary judgment is not highly favored on questions of substantial similarity in copyright cases, summary judgment is appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the non-moving party, that no reasonable juror could find substantial similarity of ideas and expression." *Shaw*, 919 F.2d at 1355(quoting *Narell v. Freeman*, 872 F.2d 907, 909-10 (9th Cir. 1989)). The Ninth Circuit has "frequently affirmed summary judgment in favor of copyright defendants on the issue of

substantial similarity, however "[w]here reasonable minds could differ on the issue of substantial similarity," summary judgment is improper. *Id.*

The "question of substantial similarity . . . dictates whether the factual copying, once established, is legally actionable." *Positive Black Talk, Inc. v. Cash Money Records*, 394 F.3d 357, 370 (5th Cir. 2004). The substantial similarity test contains intrinsic and extrinsic tests. *Funky Films, Inc. v. Time Warner Entertainment Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006). The intrinsic test examines an ordinary person's subjective impressions of the similarities between two works and is the jury's exclusive province. *Funky Films*, 462 F.3d at 1077. "The extrinsic test considers whether two works share a similarity of ideas and expressions as measured by external, objective criteria." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004). Extrinsic analysis is objective and depends on "specific criteria which can be listed and analyzed," not "the responses of the trier of fact."[7] *Funky Films*, 462 F.3d at 1077 (citation and internal quotation marks omitted).

---

[7] Although most cases apply the extrinsic evidence test in the literary, theater, or film context, and some of the factors developed in those cases would not be helpful in this case, the test has been applied in other contexts, including map cases. *See, e.g.*, *Universal Furniture Intern., Inc. v. Collezione Europa USA, Inc.*, 618 F3d 417 (4th Cir. 2010) (applying substantially similar test to furniture*); Taylor Corp. v. Four Seasons Greetings LLC*, 403 F.3d. 958, 966 (concluding that district court correctly applied extrinsic test to holiday greeting card designs by considering the cards' "similar holiday themes, paper stock and printing techniques"); *McIntosh v. Northern California Univ. Enterprises, Inc*., No. *, 2010 WL 3369848, *1 (E.D.Cal. 2010) (discussing the extrinsic evidence test in relation to copyright infringement claims arising from "a subdivision tentative map and improvement plans").

"The extrinsic test requires analytical dissection of a work and expert testimony." *Three Blind Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). "Analytical dissection" entails breaking the works "down into their constituent elements, and comparing those elements for proof of copying as measured by 'substantial similarity.'" *Rice v. Fox Broad. Co.*, 148 F.Supp.2d 1029, 1051 (C.D.Cal. 2001), *reversed on other grounds*, 330 F.3d 1170 (9th Cir. 2003). On summary judgment "only the extrinsic test is relevant, because a plaintiff avoids summary judgment by satisfying it." *Metcalf v. Bochco*, 294 F.3d 1069, 1073 (9th Cir. 2002) (citation and internal quotation marks omitted).

In a recent New Mexico case, a federal district court applied the substantial similarity analysis and explained "[r]ather than examining each map feature-by-feature, a court should focus on the overall manner in which the parties selected, coordinated and arranged the expressive elements in their maps to determine whether the 'total concept and overall feel created by the two works' is substantially similar." *Wilsonv. Brennan*, 666 F.Supp.2d 1242, 1258 (D.N.M. 2009), *affirmed* 390 Fed.Appx. 780, 2010 WL 3069616 (10th Cir. 2010). The presence of many "generic similarities and the common patterns in which they arise" help satisfy the extrinsic test. *Metcalf*, 294 F.3d at 1074. "Each note on a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection." *Id.*

Metro argues that the maps are drawn to different scales and there are over 300 differences in the street depictions. Def.'s Mem., p.13 (Dkt. 28-1) The Metro Map contains hundreds of corrections to names and locations of streets, landmarks, and city boundaries not in the Harris Map. Supp. Peggy Nelson Aff.; McFarland Aff. Metro also points out that the Harris Map contains depictions of churches, hospitals, schools, libraries, shopping centers, etc., that are

not on the Metro Map.  Metro argues that this proves its Map is not a copy of the Harris Map.

Def.'s Reply Mem. (citing *Nester's Map & Guide Corp. v. Hagstrom Map Co.*, 796 F.Supp. 729,

735 (E.D.N.Y. 1992) (finding that where "[t]he selection and arrangement of facts are . . . quite

different" there is no copyright infringement)).

However, "similarity may be regarded as 'striking' even if somewhat less than

verbatim," and "common errors at times may supply the requisite proof [of copying], if

sufficiently distinctive."  *Mowry v. Viacom International, Inc.,* 2005 WL 1793773 (S.D.N.Y.

2005) (internal citations omitted).  Here, Harris placed so-called "copyright traps" in its Map to

demonstrate that Metro engaged in copying of copyrightable elements.  "(T)he existence of

common errors is one of the most persuasive proofs of copying, second only to direct evidence

of copying."  *Hayden v. Chalafant Press, Inc.,* 281 F.2d 543, 548 (9th Cir. 1960).  Metro argues

that in this case, the alleged "common errors" are landmarks with standard shapes such as

squares or rectangles, which are not subject to copyright protection, citing *Darden v. Peters,* 488

F.3d 277, 287 (4th Cir. 2007).

Harris responds that nearly all of the landmarks and certain other features appear on the

Metro Map at the same location and with the same physical dimensions and graphical

characteristics used in the Harris Map.  *See* Dingman 1st Aff., ¶ 22.[8]  Dingman opines that the

Metro Map appears to be a near-exact mechanical reproduction of the Harris Idaho Falls Map.

Dingman 2d Aff., ¶ 11 (Dkt. 59-3).  For example, the Harris Idaho Falls Map contains a

rendering of the Lincoln Cemetery that is entirely out of proportion with the city block in which

---

[8]  As noted before, Metro moved to strike this paragraph, but the Court finds that the Second
Dingman Affidavit puts into appropriate context Dingman's use of the 2010 Harris Map and
the information relied on in this sentence reflects information appropriately in the record.

it is contained.  Harris submits that "[w]ithout the benefit of satellite imagery at the time, this area was originally illustrated on the Harris Idaho Falls Map approximately four times too large."  Dingman 1st Aff., ¶ 19 (Dkt. 41).  Also included in the various versions of the Harris Idaho Falls Map is a fictional street created by Harris and identified by the name of Mel. Mel is identified in quadrant G-5 of the Harris Idaho Falls Map.  The idea to include a copyright trap was first introduced by Mel Erickson, the former president of Harris Publishing.  "Mel" is included in quadrant C-6 of Metro Map; however, there is no actual street or road at the location in the city of Idaho Falls.  Harris Aff., ¶ 11 (Dkt. 42).  Metro argues that it did not copy "Mel Street" from the Harris, but instead used Google maps, one of the sources Metro drew on in creating the Metro Map, to locate "Mel Street."  Metro agrees that it got the name "Mel" from the Harris Map, but used the reference only after it also located the unnamed street on Google Maps.

Although some of these items may not be subject to copyright protection, the existence of "false" items such as "Mel Street" provides evidence of copying.  Rather than examining each map feature-by-feature, the Court will focus on the overall manner in which the parties selected, coordinated, and arranged the expressive elements in their maps and will consider that certain features appear in a certain manner only on the Harris Map, and also appear on the Metro Map in a similar manner.  The similarities overall, coupled with the disputes of fact as to whether ceratin, specific elements were copied from the Harris Map and Metro's evidence about how it went about creating its map, precludes summary judgment in favor of Defendant on the issue of whether any copyrightable elements have been copied on the Metro Map.

**4. The Fair Use Doctrine**

The fair use doctrine, "permits courts to avoid rigid application of the copyright statute when . . . it would stifle the very creativity which that law is designed to foster." *Iowa State University Research Foundation, Inc. v. American Broadcasting companies*, 621 F.2d 57, 60 (2nd Cir. 1980). The doctrine is codified in 17 U.S.C. § 107, which provides, in relevant part:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

The statute "leaves to the courts how to assign relative weights to each factor and how to supplement the first four factors." *Pacific and Southern Co.*, 744 F.2d at 1495, n.7. "The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis . . . . Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78, 114 S.Ct. 1164 (1994). Additionally, fair use is an "affirmative defense"; thus, Metro bears the burden of proof. *Campbell*, 510 U.S. at 590, 114 S.Ct. at 1177.

The Court finds that the commercial nature of Metro's use weighs against a finding of fair use. At the hearing, Metro's counsel conceded this first factor, but argued that the last three weigh in its favor. The Court acknowledges that the nature of maps, which almost always contain factual information, may result in factor two weighing in favor of Metro, but disagrees with Metro's characterization of maps having "thin" protection. The Ninth Circuit discussed the protection afforded to maps in *United States v. Hamilton* and explained:

> [Some copyright cases] suggest that we should insist upon a standard of originality that is more demanding in cases respecting maps than with other works subject to copyright. If this approach reflects a concern that cartographers might be excluded entirely from using valuable maps in the public domain because a private party has a previous copyright on a map which utilizes the public domain information, the fear, of course, is a false one; for the fact that one person studies other works so as to produce from those elements a new work with sufficient originality to obtain a copyright does not prevent a different author from making independent use of his own skills and efforts to do precisely the same thing.

*Hamilton*, 583 F.2d 448 (9th Cir. 1978).

Additionally, as to the third factor, there are issues of fact about the amount and substantiality of the portion used in relation to the copyrighted work as a whole. This factor "calls for thought not only about the quantity of the materials used, but about their quality and importance, too." *Campbell*, 510 U.S. at 587. The Court concludes that, because there are so many disputed facts as to if and how Metro copied any of the elements of Harris's Map, summary judgment cannot be granted on the fair use issue.[9] *See, e.g.*, *Lindal Cedar Homes, Inc.*

---

[9] Based on the Court's decision about disputed facts on the third factor, the Court will not consider the fourth factor, which "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a

*v. Ireland*, No. Civ.03–6102–TC, 2004 WL 2066742, *5 (D.Or. Sept. 14, 2004) ("[f]air use

determinations call for case by case analysis and involve mixed questions of law and fact.

Because the fair use question is so highly dependent on the particular facts of each case, courts

have usually found it appropriate to allow the matter to go to trial, although the matter can be

determined at the summary judgment stage when no material issues of fact remain to be tried").

**5.      Because There is no Evidence of "Deliberate Misrepresentation" the
         Copyright Registration is Not Invalid**

Metro argues that Harris defrauded the Copyright Office because it did not register its

maps as derivative works.  Def.'s Mem., p.10 (Dkt. 28-1).  A copyright registration may be held

invalid, and incapable of supporting an infringement action, if the holder has "knowingly failed

to advise the Copyright Office of facts which might have occasioned a rejection of the

application."  *Zitz v. Pereira Podlas*, 119 F.Supp.2d 133, 142-43 (E.D.N.Y. 1999) (internal

citations omitted).  However, the presumption of copyright validity can "only be overcome by

proof of deliberate misrepresentation"; "omissions that are inadvertent or innocent will not result

in the invalidation of the copyright."  *Id.*  Metro's claim of fraud also rests heavily on its

assertion that Harris relied only on the P&Z Map to create the Harris Map.  The Court has

already found disputed issues of material fact exist about the particular details of Harris Map's

creation and Metro has not submitted evidence of deliberate misrepresentation sufficient to

invalidate Harris's copyright.  Accordingly, summary judgment on this issue also will be denied.

---

substantially adverse impact on the potential market' for the original."  *Campbell*, 510 U.S.
at 590 (quoting Nimmer § 13.05[A] [4], p. 13-102.61).

**C.      Unfair Competition Claims**

Harris asserted a federal unfair competition claim as well as a common law unjust enrichment and unfair competition claim.  Compl., pp. 4-6 (Dkt. 1).  Although Metro did not discuss the specific requirements of each claim or the relevant caselaw, they argue that there are no facts in evidence that could support such claims.  Def.'s Mem., pp. 18-20 (Dkt. 28-1).  The parties, in general, provide very little argument and almost no points and authorities for their respective positions on this issue.  For that reason alone, the Court may deny summary judgment.  *See* D. Idaho L. Civ. R. 7.1(b)(1) & (c)(1) (requiring the parties to provide points and *authorities*).  However, the Court will briefly consider the parties' arguments.

**1.      Idaho state law**

Idaho courts recognize the tort of unfair competition.  *See Cazier v. Economy Cash Stores*, 71 Idaho 178, 228 P.2d 436 (1951).  "The law of unfair competition has its roots in the common-law tort of deceit; its general concern is with protecting consumers from confusion as to source."  *Woodland Furniture, LLC v. Larsen*, 142 Idaho 140, 147, 124 P.3d 1016, 1023 (2005) (quoting *Bonito Boats, Inc., v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989) (internal quotation marks omitted)).

The Idaho Supreme Court has relied on the Restatement (Third) of Unfair Competition § 4 for the elements of the tort, which provides that one is subject to liability if: "[I]n connection with the marketing of goods or services, the actor makes a representation likely to deceive or mislead prospective purchasers by causing the mistaken belief that the actor's business is the business of the other, or that the actor is the agent, affiliate, or associate of the other, or that the goods or services that the actor markets are produced, sponsored, or approved by the other."

*Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1084 (2010) (explaining that the fact

employees for respondent continued to wear P & E clothing and use P & E cell numbers created

a genuine issue of material fact as to whether the employees were making representations likely

to deceive or mislead appellant's customers).

### 2.     The Federal Act

Section 43(a) of the Lanham Act states:

> (1) Any person who, on or in connection with any goods or
> services, or any container for goods, uses in commerce any word,
> term, name, symbol, or device, or any combination thereof, or any
> false designation of origin, false or misleading description of fact,
> or false or misleading representation of fact, which-
> (A) is likely to cause confusion, or to cause mistake, or to deceive
> as to the affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval of his
> or her goods, services, or commercial activities by another person,
> shall be liable in a civil action by any person who believes that he
> or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  This section of the Lanham Act prohibits use of false designations of

origin, descriptions, or representations in advertising in sale of goods and services.  *Waits v.

Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992), *cert. denied*, 113 S.Ct. 1047, 506 U.S. 1080.

### 3.     Discussion

Metro argues that it has not represented to anyone that it is the official map of, or was

ever endorsed by, the City or the Idaho Falls Chamber of Commerce, Nelson Aff., ¶¶ 13, 18, 19;

Def.'s Mem., p.18, and argues additionally that Harris has not submitted any admissible

evidence to support its unfair competition claim.  The Court has not considered the Affidavits

submitted by Harris that Metro argues contain hearsay, but has considered the "script"

(introduced as Exhibit C to the Nelson Aff.) used by Metro in selling advertising space.  Metro

no longer has a copy of the actual script used to sell advertising in the 2009 Metro Map,

However, the most recent script, which a September 17, 2010 letter from Mr. McFarland

indicates was "identical to the script used in 2009 to sell advertising space on the Metro Map,"[10]

except for the references to 2010, Cather Aff., ¶ 5 & Ex. A (Docket Nos. 59-1 & 59-2), raises an

inference of unfair competition, which must be construed in favor of Harris as the non-movant.

Thus, summary judgment in favor of Metro on the unfair competition claims also is denied.

### III. ORDER

Based on the foregoing discussion, **IT IS HEREBY ORDERED** that Defendant's

Motion for Summary Judgment (Dkt. 28) is DENIED, and the related Motion for Attorney Fees

(Dkt. 30) is DENIED as moot, without prejudice to reconsideration should Defendant Metro

prevail at trial.

In accordance with the order postponing mediation until after a ruling on the summary

judgment proceedings (Dkt. 36), counsel shall confer about their mediation preferences and

proposed dates for mediation, then shall contact Susie Boring-Headlee, the ADR Coordinator,

for the purpose of assisting the parties in the selection of a mediator and scheduling of this

matter. Counsel shall contact Ms. Boring-Headlee at 208-334-9067 on or before **October 16,**

**2011**. The mediation shall be completed by **December 16, 2011**. A mediation status report is

due no later than **December 29, 2011**.

---

[10]  There is contrary evidence in the record. Nelson avers that the script for the Idaho Falls
map looked substantially the same, although Metro did not represent that it had previously
published a map of Idaho Falls. Nelson Aff., ¶ 2 (Dkt. 49-1). Either way, disputed issues of
material fact preclude summary judgment in this case.

Counsel for both parties shall confer with their clients and witnesses about possible dates for trial in January, February, March, April, May, and June 2012. On or before **October 19, 2011**, counsel shall file a joint, written notice stating all of the dates when both parties and all counsel are available for trial during the months of January, February, March, April, May, and June of 2012. Any motions contemplated by the Court's Order at Dkt. 73 shall be filed on or before November 4, 2011.

DATED: **September 30, 2011**.

Honorable Ronald E. Bush
U. S. Magistrate Judge